Case No. 26-5099

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

KE HOLDINGS LLC, dba Ascent Construction; ENRIQUE SELMAN; JEAN LAFITTE BUILDERS LLC, fka Jean Lafitte Designs LLC, On Behalf of Themselves and All Others Similarly Situated; INFINIUM BUILDERS LLC,

Plaintiffs – Appellees

v.

THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY,

Defendant – Appellant

Appeal from the United States District
Court for the Middle District of Tennessee
Nashville Division
Case No. 3:23-cv-00924

---

# BRIEF OF APPELLEES

---

Joshua A. Frank
David W. Garrison
Scott P. Tift
**Barrett Johnston Martin & Garrison, PLLC**
200 31st Avenue North
Nashville, TN 37203
Telephone: (615) 244-2202

R. Alex Dickerson
Sarah Ingalls
**Thompson Burton PLLC**
1801 West End Avenue, Suite 1550
Nashville, TN 37203
Telephone: (615) 465-6000

**Attorneys for Appellees**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 6 Cir. R. 26.1, Plaintiffs-Appellees Infinium Builders LLC, KE Holdings LLC d/b/a Ascent Construction, Enrique Selman, and Jean Lafitte Builders LLC f/k/a Jean Lafitte Designs LLC state as follows:

Appellee Infinium Builders LLC is not a subsidiary or affiliate of a publicly owned company, and there is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome of this appeal.

Appellee KE Holdings LLC d/b/a Ascent Construction is not a subsidiary or affiliate of a publicly owned company, and there is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome of this appeal.

Appellee Enrique Selman is a natural person. Accordingly, Appellant Bazemore is not a subsidiary or affiliate of a publicly owned company, and there is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome of this appeal.

Appellee Jean Lafitte Builders LLC f/k/a Jean Lafitte Designs LLC is not a subsidiary or affiliate of a publicly owned company, and there is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome of this appeal.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. INTRODUCTORY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . 4

II. THE REQUIREMENTS OF METRO'S SIDEWALK ORDINANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. METRO'S SIDEWALK ORDINANCE IS UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV. PLAINTIFFS COMPLIED WITH, AND WERE THEREFORE HARMED BY, THE SIDEWALK ORDINANCE. . . . . . . . . . . 13

V. THE DISTRICT COURT'S OPINION AND ORDER. . . . . . . . 15

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I. PLAINTIFFS' CLAIMS SATISFY FINALITY. . . . . . . . . . . . . 20

A. *Williamson County's* exhaustion requirement has been overturned. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. For land-use exaction claims like those here, compliance with the Ordinance satisfies finality. . . . . . . . . . . . . . . . . . . . 22

II. COMPLIANCE WITH THE SIDEWALK ORDINANCE WAS NOT VOLUNTARY. . . . . 26

A. Land-use exactions like the Sidewalk Ordinance are inherently coercive and compliance is not voluntary. . . . . . . 26

B. For permit applicants like Plaintiffs, compliance with the Sidewalk Ordinance was inescapable. . . . . 29

III. METRO ASKS THIS COURT TO FLOUT *KNICK* AND *PAKDEL* AND REVIVE THE EXHAUSTION REQUIREMENT UNDER THE GUISE OF "VOLUNTARINESS.". . . . . 34

A. Metro's description of the Plaintiffs' compliance as "voluntary" is a rhetorical Trojan Horse for exhaustion. . . . . 34

B. Metro's description of finality in the takings context is not supported by the law. . . . . 35

C. Metro relies on several inapplicable cases to bolster its effort to use "voluntariness" to revive exhaustion in this context. . . . . 37

CONCLUSION . . . . . 46

CERTIFICATE OF COMPLIANCE . . . . . 47

ADDENDUM . . . . . 49

CERTIFICATE OF SERVICE . . . . . 51

## TABLE OF AUTHORITIES

**Cases**

*24th Senatorial Dist. Republican Comm. v. Alcorn*,
820 F.3d 624 (4th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Armstrong v. United States*,
364 U.S. 40 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Barber v. Charter Twp. of Springfield, Mich.*,
31 F.4th 382 (6th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Buchholz v. Meyer Njus Tanic, PA*,
946 F.3d 855 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Carman v. Yellen*,
112 F.4th 386 (6th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Eastern Enterprises v. Apfel*,
524 U.S. 498 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Evans v. City of Ann Arbor*,
No. 3:21-cv-10575, 2022 WL 586753
(E.D. Mich. Feb. 25, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-42

*Fowler v. Guerin*,
899 F.3d 1112 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Gradisher v. Cnty. of Muskegon*,
255 F. Supp. 2d 720 (W.D. Mich 2003) . . . . . . . . . . . . . . . . . . . 41

*Grand v. City of Univ. Heights, Ohio*,
159 F.4th 507 (6th Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Heritage at Pompano Housing Partners, L.P. v. City of Pompano Beach, Fla.*,
No. 0:20-cv-61530-RS, 2011 WL 8875658
(S.D. Fla. Dec. 15, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Jackson v. City of Cleveland*,
925 F.3d 793 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Knick v. Township of Scott*,
588 U.S. 180 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Knight v. Metropolitan Government of Nashville & Davidson County, Tennessee*,
572 F. Supp. 3d 428 (M.D. Tenn. 2021) . . . . . . . . . . . . . . . . . . . 32-33

*Knight v. Metropolitan Government of Nashville & Davidson County, Tennessee*,
67 F.4th 816 (6th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*L.L. Nelson Enter., Inc. v. Cnty. of St. Louis, Mo.*,
673 F.3d 799 (8th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

*Lilly Invs. v. City of Rochester*,
674 F. App'x 523 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Manistee Apartments v. Chicago*,
No. 1:14-cv-6813, 2015 WL 10853988
(N.D. Ill. Apr. 3, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*McCarthy v. City of Cleveland*,
626 F.3d 280 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-40, 42

*Newberg Crestview, LLC v. City of Newberg*,
No. 3:22-cv-1289-AR, 2023 WL 8372167
(D. Or. Dec. 4, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

*Newberg Crestview, LLC v. City of Newberg*,
No. 3:22-cv-1289-AR, 2024 WL 4581543
(D. Or. Oct. 25, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27-28

*Nollan v. California Coastal Comm'n*,
483 U.S. 825 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Pakdel v. City & County of San Franscisco*,
594 U.S. 474 (2021) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*Roberts v. Progressive Preferred Ins. Co.*,
167 F.4th 955 (6th Cir. 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

*Silver Buckle Mines, Inc. v. United States*,
132 Fed. Cl. 77 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Silvernail v. Cnty. of Kent*,
385 F.3d 601 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Suitum v. Tahoe Reg'l Plan. Agency*,
520 U.S. 725 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23-24

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*SW Nashville EB Owner, LLC v. Metropolitan Government of Nashville & Davidson County, Tennessee*,
No. 3:24-cv-00710, 2025 WL 875366
(M.D. Tenn. Mar. 20, 2025). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*,
473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Yee v. City of Escondido, Cal.*,
503 U.S. 519 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

**Statutes**

28 U.S.C. § 1292. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

**Ordinances**

Metro. Code § 17.20.120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Metro. Code § 17.20.125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellees Infinium Builders LLC, KE Holdings LLC, Enrique Selman, and Jean Lafitte Builders LLC (collectively, "Plaintiffs") contend that this interlocutory appeal by Defendant Metropolitan Government of Nashville and Davidson County ("Metro") presents no novel issues. The issues raised are subject to a straightforward analysis of the finality requirement articulated by the U.S. Supreme Court in *Knick v. Township of Scott*, 588 U.S. 180 (2019), and *Pakdel v. City & County of San Francisco*, 594 U.S. 474 (2021) (per curiam), and their progeny, which the district court correctly applied. Plaintiffs do not agree with Metro's characterization that "[t]he decision below created a new avenue" to satisfy finality "out of whole cloth" or that there are "complex questions regarding finality, ripeness, and justiciability raised by the district court's decision" that "present issues of first impression in this circuit." (Appellant's Br. 1-2.)[1]

However, because Metro's "voluntary payment" argument attempts to recast the district court's straightforward finality analysis as unprecedented and to smuggle the exhaustion requirement abrogated by the Supreme Court in *Knick* and *Pakdel* back into the finality analysis for takings claims, the Court may benefit from oral argument to disentangle this rhetoric. Thus, Plaintiffs support oral argument.

[1] Metro's Brief is cited by identifying the page number at the bottom of each page.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this interlocutory appeal pursuant to 28 U.S.C. § 1292.

**STATEMENT OF THE ISSUES FOR REVIEW**

1. Whether Metro's requirement to construct sidewalk or pay a fee in lieu of constructing sidewalk imposed as a condition of receiving a building permit is sufficient to establish finality when the U.S. Supreme Court has held in *Knick* and *Pakdel* that takings plaintiffs are not subject to an administrative exhaustion requirement and must be treated just like any other plaintiff asserting constitutional violations under 42 U.S.C. § 1983?

2. Whether the injury suffered by Plaintiffs who constructed sidewalk or paid a fee in lieu of constructing sidewalk as a condition of receiving a building permit from Metro was caused by Metro's application of the ordinance requiring this as a condition for seeking a building permit?

<u>**STATEMENT OF THE CASE**</u>

## I. INTRODUCTORY STATEMENT

Plaintiffs filed this class action to recover funds Metro owes to property owners who Metro required to build sidewalk or to pay a fee in lieu of building sidewalk as a condition of receiving a building permit. In *Knight v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 67 F.4th 816 (6th Cir. 2023), this Court held that this scheme imposed an unconstitutional condition on permits. In *Knight*, Metro argued that its Sidewalk Ordinance was passed "as a 'legislative' condition *for all permits*," *id.* at 829 (emphasis added). At oral argument, Metro "conceded that the city abandoned any defense under *Nollan*'s test," instead "reason[ing] that the test is 'an extremely difficult standard to meet, and the sidewalk ordinance likely doesn't meet that standard.'" *Id.* at 836 (quoting Metro's Counsel at Arg. 31:22-30).

Following this Court's *Knight* ruling Metro quickly abandoned its administration of the Sidewalk Ordinance altogether, without legislative action. However, following *Knight*, Metro did not take steps to simply reimburse all property owners financially harmed by its unconstitutional Ordinance. As a result, this class action was brought to ensure that all those injured by the unconstitutional Ordinance receive compensation for the damages they suffered by complying with Metro's Sidewalk Ordinance. While Metro appears to concede that its Ordinance

could not be administered to protect its citizens' constitutional rights, it has mounted a defense in this litigation that straightforward compliance with the Ordinance does not satisfy finality and, indeed, that the costs of compliance were not even caused by Metro. Metro takes this novel position to escape the inevitable—a finding that it violated the constitutional rights of all those who were faced with its self-described "'legislative' condition for all permits" and that it owes them compensation.

## II. THE REQUIREMENTS OF METRO'S SIDEWALK ORDINANCE

Until Metro stopped its enforcement following this Court's decision in *Knight*, the Sidewalk Ordinance required property owners either to build sidewalk or to pay a fee in lieu of building sidewalk in order to secure a construction permit. (*See generally* Metro. Code § 17.20.120, RE 125-1, PageID # 1766-70.) In *Knight*, Metro summarized the Ordinance's effect as requiring property owners "in urban areas of the city to install sidewalks or pay a fee in lieu of sidewalk construction." (Metro's *Knight* Appellate Brief at 3, RE 125-2, PageID#: 1785.)

The text of the Ordinance opened by setting forth the purposes of the legislative permit conditions it imposed, noting Nashville's growth, identifying general benefits of sidewalk, and then identifying these *general* benefits as the reasons for the sidewalk requirements. (Metro. Code § 17.20.120, RE 125-1, PageID # 1766; Metro's *Knight* Appellate Brief at 3-4, RE 125-2, PageID#: 1785-86.) The Ordinance then described what types of construction it applied to, Metro. Code

§ 17.20.120(A)1 and (A)2, the geographic area where it applied, *id.* § 17.20.120(A)1 and (A)2, the easement/right-of-way requirement, *id.* § 17.20.120(E), the nature of the sidewalk construction that was required, *id.* § 17.20.120(B), (C)1, and (C)2, when sidewalk construction could have been excused, *id.* § 17.20.120(C)1.a-e, when payment in lieu was an option, *id.* § 17.20.120(D)1, and the narrow circumstances when its requirements could have been waived and to what extent, *id.* § 17.20.120(A)3.a–g. (Metro. Code § 17.20.120, RE 125-1, PageID # 1766-69.)

The Sidewalk Ordinance lists only seven circumstances in which a waiver is permitted. (Metro. Code § 17.20.120(A)3.a-g, RE 125-1, PageID # 1767-68.) The seven circumstances allowing a waiver of sidewalk construction because it would not serve the general purposes of the Sidewalk Ordinance (subsections a[2] and g[3]), apply only where other general purposes of Metro's zoning regulations would

2 Subsection a is implicated only where the Sidewalk Ordinance's general "goal of extending or completing a sidewalk network" would not be served and there is some unique hardship or impracticability that makes this so. (Metro. Code § 17.20.120(A)3.a, RE 125-1, PageID # 1767.)

3 Subsection g applies only to corner lots in R and RS zoned districts where a new sidewalk is determined to be inappropriate. (Metro. Code § 17.20.120(A)3.g, RE 125-1, PageID # 1768.) As Metro's Zoning Administrator, Joey Hargis, testified, situations that fall under subsection g are those that would simply not satisfy the general purpose of constructing a sidewalk network because a sidewalk would be impracticable, impossible, or nonsensical. (Hargis Depo. 121:13-18, RE 125-6, PageID # 1878.)

conflict (subsections c,[4] e,[5] f[6]), do not permit complete waiver (subsection b[7]), or deal solely with rebuilding of homes destroyed by disaster or accident (subsection d[8]). (Metro. Code § 17.20.120(A)3.a-g, RE 125-1, PageID # 1767-68.) These are the only circumstances in which Metro's Zoning Administrator was permitted to grant a waiver and did so. (Hargis Depo. 100:4-22, 121:22-123:5, RE 125-6, PageID # 1873, 1878-80 (testifying that waiver was only permitted under these circumstances and that he granted waivers only under these circumstances).)

The Ordinance expressly stated that its requirements to build or to pay in-lieu were conditions for the issuance of a permit. (Metro. Code § 17.20.120(D)(3) and (F), RE 125-1, PageID # 1769.) When a new permit application was submitted, Metro's Codes Department determined whether the Sidewalk Ordinance's

---

4 Subsection c allows a waiver for properties receiving public incentives for affordable housing. (Metro. Code § 17.20.120(A)3.c, RE 125-1, PageID # 1767.)

5 Subsection e applies to properties in Historic Zoning Overlay Districts, "where new sidewalks would be detrimental to the historic nature of the street." (Metro. Code § 17.20.120(A)3.e, RE 125-1, PageID # 1767.)

6 Subsection f applies to areas where Metro has already built or is reasonably expected to build a greenway within six years. (Metro. Code § 17.20.120(A)3.f, RE 125-1, PageID # 1767.)

7 Subsection b only allows waiver of the requirement to build sidewalk and instead pay an in-lieu fee (*i.e.*, not a complete waiver) for all or a part of a property's frontage in highly unusual circumstances that "shall be limited to unique situations that are not typical." (Metro. Code § 17.20.120(A)3.b, RE 125-1, PageID # 1767.)

8 Subsection d applies only to the rebuilding of homes that were destroyed by natural disaster, fire, or accident. (Metro. Code § 17.20.120(A)3.d, RE 125-1, PageID # 1767.)

requirements applied to the property and building project. (Hargis Depo. 26:18-28:12, RE 125-6, PageID # 1865-67.) Staff then input this determination into an electronic database called CityWorks / ePermits, which contained all permitting requirements for the project. (Hargis Depo. 15:8-24, 16:4-17:1, 19:23-20:11, 26:18-28:12, RE 125-6, PageID # 1856-60, 1865-67.) From that point, a permit seeker could not escape the costs of the Sidewalk Ordinance unless Metro had mistakenly determined that the Sidewalk Ordinance applied to the property in question. (Hargis Depo. 138:17-140:14, 141:8-19, RE 125-6, PageID # 1883-86 (Metro would refund waiver fees and in-lieu fees only when it determined it erroneously applied the Sidewalk Ordinance to a property where it does not apply).)

In order to seek a waiver of the Sidewalk Ordinance's requirements under Section (A)3.a-g, a property owner had to pay $360.00 waiver fee. (Hargis Depo. 135:6-136:9 and Ex. 10, RE 125-6, PageID # 1881-82, 1921-22.) That $360.00 fee was nonrefundable, even if the applicant ultimately received a waiver. (Hargis Depo. 138:17-139:25, RE 125-6, PageID # 1883-84 (testifying that Metro did not refund the waiver fee for successful waiver applications and only refunded the waiver fee if the Sidewalk Ordinance was erroneously applied in the first place, *i.e.*, no waiver was even necessary).) Even when granted, a waiver application infrequently resulted in a "full waiver" (meaning complete relief from the requirements of the Sidewalk Ordinance). (Hargis Depo. 104:18-105:3, RE 125-6, PageID # 1874-75.) Instead,

successful waivers almost always resulted in the payment of an in-lieu fee. (Hargis Depo. 106:16-107:7, RE 125-6, PageID # 1876-77.)

Again, a waiver could only be granted for the narrowly prescribed reasons enumerated at Metro. Code § 17.20.120(A)3.a–g. (Metro. Code § 17.20.120(A)3.a-g, RE 125-1, PageID # 1767-68; Hargis Depo. 100:4-22, 121:22-123:5, RE 125-6, PageID # 1873, 1878-80.) And, again, these reasons were all tied to the broad aims of the Sidewalk Ordinance, applied where other purposes of Metro's zoning or housing regulations conflicted, did not permit complete waiver (*i.e.*, only permitted paying an in-lieu fee), or dealt solely with rebuilding homes destroyed by disaster or accident. (Metro. Code § 17.20.120(A)3.a-g, RE 125-1, PageID # 1767-68.) The Board of Zoning Appeals ("BZA") only had appellate jurisdiction to review the Zoning Administrator's adverse waiver decisions. (Metro. Code § 17.20.125, RE 125-1, PageID # 1769-70 ("The board of zoning appeals shall not accept an application until the zoning administrator has made a determination on the requirement as set forth in this chapter."); Hargis Depo. 168:14-170:6, RE 125-6, PageID # 1889-1891 (testifying that "BZA didn't have jurisdiction to consider a BZA appeal here unless you had already adjudicated a waiver" and that "everything the BZA was doing after that point would have been an appellate procedure appealing your decision or your predecessor's decision on a waiver request").)

When a permit applicant complied with the Sidewalk Ordinance by paying the fee in lieu, the applicant paid the requisite amount to the Codes Department or to the Nashville Department of Transportation ("NDOT") (formerly, the Department of Public Works). (Hargis Depo. 67:4-24, RE 125-6, PageID # 1869.) When a permit applicant complied by building sidewalk, a plan was first submitted to Codes, with the sidewalk reviewed by NDOT following its construction. (Hargis Depo. 16:4-11, 20:24-21:17, RE 125-6, PageID # 1857, 1860-61.) Construction of the sidewalk was typically the last thing done before final inspection and issuance of a final use and occupancy ("U&O") letter. (Hargis Depo. 217:5-16, 230:13-231:4, RE 125-6, PageID # 1910-12.) The final U&O letter was then issued if Metro determined that a property complied with all building inspection requirements, including the Sidewalk Ordinance. (Hargis Depo. 23:23-25:19, 49:3-17, 80:11-82:9, 196:10-197:12, 208:23-209:10, 215:15-20, 249:20-250:13, RE 125-6, PageID # 1862-64, 1868, 1870-72, 1896-97, 1903-04, 1909, 1917-18; Revetta Depo. 173:9-174:13, RE 125-9, PageID # 2233-34; Honeycutt Depo. 26:2-20, 30:2-31:3, RE 125-7, PageID # 2061-63.) Prior to the issuance of a U&O letter, NDOT could still determine that the permit applicant's compliance with the Ordinance's sidewalk standards was insufficient. Hargis Depo. 49:3-49:17, 80:11-82:9, RE 125-6, PageID # 1868, 1870-72; Honeycutt Depo. 30:2-31:3, RE 125-7, PageID # 2062-63.) After the issuance

of the final U&O letter, sidewalk waivers could not be obtained. (Hargis Depo. 170:10-19, RE 125-6, PageID # 1891.)[9]

In short, the Sidewalk Ordinance was structured to impose a cost on *everyone* seeking a permit to build on a covered property—and this class action seeks a recovery for those on whom this cost was imposed. In nearly all cases, the permit seeker either had to build sidewalk or to make an in-lieu payment to receive a construction permit, and in those rare cases where a permit applicant sought and received a waiver of the Ordinance's requirement, complete relief was infrequent and the permit applicant still had to pay a nonrefundable $360 waiver fee.

## III. METRO'S SIDEWALK ORDINANCE IS UNCONSTITUTIONAL

On May 10, 2023, this Court held that the Sidewalk Ordinance constituted an unconstitutional exaction due to its failure to satisfy the *Nollan-Dolan* unconstitutional conditions test. *Knight*, 67 F.4th at 824. *Knight* premised its holding on the fact—conceded by Metro there—that the Ordinance's conditions were "legislatively *compelled* permit conditions." 67 F.4th at 829 (holding that *Nollan*-

---

[9] Plaintiffs' position is that the final U&O letter date controls when the statute of limitations began to run (absent equitable estoppel or continuing violation), as that is the date on which Metro determined it was satisfied with an individual or entity's compliance with the Sidewalk Ordinance and a new sidewalk is available for use by the public. In other words, that is the date on which the taking was complete. The district court rejected this argument, but Plaintiffs preserve it for potential direct appeal. (*See* Memorandum Opinion on Metro's Motion for Summary Judgment ("MSJ Opinion"), RE 135, PageID # 2583-86).

*Dolan* "applies just as much to legislatively compelled permit conditions as it does to administratively imposed ones"). *Knight* held that courts must assess permit conditions, like the Sidewalk Ordinance, under the three-step unconstitutional conditions test the U.S. Supreme Court articulated in *Koontz*, *Nollan*, and *Dolan*.[10] *Id.* at 818.

During oral argument, Metro conceded the that the *Nollan-Dolan* test is "an extremely difficult standard to meet, and the sidewalk ordinance likely doesn't meet that standard." *Id.* at 836. Indeed, despite the *Knight* plaintiffs devoting "pages of their brief [to] arguing that the city could not meet *Nollan*'s and *Dolan*'s elements," Metro "did not even try to respond, opting to rely exclusively on its claim that *Penn Central*'s test applied." *Id.* This is not surprising since any argument that the Sidewalk Ordinance met *Nollan-Dolan* fails.

Within days of the Sixth Circuit's *Knight* decision, Metro ceased enforcement and implementation of the Sidewalk Ordinance. (Kumrow Depo. 18:3-9, 38:3-8, RE 125-8, PageID # 2066, 2069; Hargis Depo. 192:7-194:16, RE 125-6, PageID # 1892-94.) Metro then reached a settlement with the *Knight* plaintiffs that included an injunction, entered by this Court, formalizing Metro's agreement not to enforce the

---

[10] *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

Sidewalk Ordinance. (*Knight* Agreed Order for Entry of Judgment, RE 125-3, PageID # 1836.)

## IV. PLAINTIFFS COMPLIED WITH, AND WERE THEREFORE HARMED BY, THE SIDEWALK ORDINANCE.

As with the *Knight* plaintiffs, the Plaintiffs in this action incurred thousands of dollars of damages due to their compliance with the Sidewalk Ordinance. For purposes of opposing Metro's summary judgment motion, Plaintiffs identified only the impacted properties that fell within the statutory period identified by the district court following its ruling granting in part and denying in part an earlier motion by Metro for judgment on the pleadings (Memorandum Opinion on Motion for Judgment on the Pleadings, RE 80), which rejected Plaintiffs' position that Metro's constitutional violation was continuing in nature:[11]

| Party | Property | Pay In-Lieu Date | Build Date | Final U&O Letter Date | Voluntary |
|---|---|---|---|---|---|
| Ascent | 1323 Harding Pl. (Dickerson Decl., RE 125-10, PageID # 2268-69) | 06/14/2022 | | 09/19/2023 | No |
| Ascent | 1407 Harding Pl. (*Id.*, RE 125-10, | 08/30/2022 | | 12/13/2023 | No |

[11] Plaintiffs preserved their objections to that ruling for direct appeal. The Court will also note that Infinium Builders LLC is not listed. Plaintiffs conceded, for purposes of Metro's Motion only, that Infinium, which did not own the properties at issue, does not have a takings claim. This concession, however, did not and does not extend to the properties impacted by the Court's ruling on the continuing violations doctrine, on which there was no discovery due to the pleading-stage dismissal of claims reliant on that doctrine.

| | | | | | |
|---|---|---|---|---|---|
| | PageID # 2277-78) | | | | |
| Ascent | 3998 Harding Pl. (*Id.*, RE 125-10, PageID # 2302-03) | 02/02/2023 | | 04/03/2024 | No |
| Ascent | 4000 Harding Pl. (*Id.*, RE 125-10, PageID # 2311-12) | 02/02/2023 | | 03/12/2024 | No |
| Ascent | 796 Montrose Ave. (*Id.*, RE 125-10, PageID # 2252-53) | 01/13/2023 | | 10/12/2023 | No |
| Ascent | 2509 Vaulx Ln. (*Id.*, RE 125-10, PageID # 2288-89) | 01/13/2023 | | 10/27/2023 | No |
| Jean Lafitte | 6205 Freedom Dr. (*Id.*, RE 125-10, PageID # 2482-83) | 09/28/2021 | | 06/02/2023 | No |
| Jean Lafitte | 6207 Freedom Dr. (*Id.*, RE 125-10, PageID # 2491-92) | 09/29/2021 | | 06/28/2023 | No |
| Jean Lafitte | 646 A Vernon Ave. (*Id.*, RE 125-10, PageID # 2462-63) | 02/24/2023 | | 03/22/2023 | No |
| Jean Lafitte | 646 B Vernon Ave. (*Id.*, RE 125-10, PageID # 2472-73) | 02/24/2023 | | 03/01/2023 | No |
| Selman | 2838 A Bronte Ave. (*Id.*, RE 125-10, PageID # 2495-96) | | 04/12/2023 | 04/28/2023 | No |
| Selman | 2838 B Bronte Ave. (*Id.*, RE 125-10, PageID # 2498-99) | | 04/12/2023 | 04/18/2023 | No |

(Paine Decl. ¶¶ 3-10, RE 125-12, PageID # 2503-04; Lee Decl. ¶¶ 3-8, RE 125-11, PageID # 2501-02; Selman Decl. ¶¶ 3-6, RE 125-14, PageID # 2507-08; *see also generally* Dickerson Decl. and Attached Property Records, RE 125-10 (citations in table above).) The chart above indicates the dates when in-lieu fees were paid or

when sidewalk was built (whichever applies), the date final U&O letters were issued, and whether compliance was voluntary.

## V. THE DISTRICT COURT'S OPINION AND ORDER

The district court granted Metro's summary judgment motion in part and denied it in part. (*See generally* MSJ Opinion, RE 135). Plaintiffs continue to preserve their positions on the issues resolved adversely for direct appeal. The only portion of the district court's ruling that is at issue here is its ruling that Plaintiffs' claims that were not dismissed on other grounds are ripe because they satisfy finality. (Memorandum and Order Certifying Interlocutory Appeal ("Interloc. Appeal Order"), RE 140, PageID # 2655). Under the district court's ruling, Metro correctly points out that the following claims have been found ripe and timely:

- Ascent: 1323 Harding Pl., 1407 Harding Pl., 3998 Harding Pl., 4000 Harding Pl., 796 Montrose Ave., 2509 Vaulx Ln.

- Jean Lafitte: 6205 Freedom Dr., 6207 Freedom Dr., 646 A Vernon Ave., 646 B Vernon Ave.

(Appellant's Br. 9-10.)

The district court found the claims at issue to satisfy finality, holding:

> In this case, the plaintiffs achieved finality when they were assessed a fee in exchange for a building permit, paid the fee, and were issued a building permit. The time to appeal has expired, and the record strongly suggests that appeals would have been largely futile anyway, except under the narrow circumstances described by the Ordinance. *See* Metro. Code § 17.20.120(A)(3). More to the point, the plaintiffs are not awaiting a decision, and "there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Pakdel*,

> 594 U.S. at 478 (quoting *Suitum*, 520 U.S. at 739). No avenue remains open for the government to clarify or change its position. Upon paying into the Sidewalk Fund to satisfy a condition for obtaining a building permit, each plaintiff was actually "injured by the Government's action and is not prematurely suing over a hypothetical harm." *Pakdel*, 594 U.S. at 478 (internal quotation marks and citation omitted).

(MSJ Opinion, RE 135, PageID # 2572-73). The district court spent five pages analyzing the controlling case law, considering and distinguishing the cases cited by Metro, ultimately determining that these claims satisfy the central requirements of the prudential ripeness doctrine, which this Court has held are not to be applied "mechanistically." (MSJ Opinion, RE 135, PageID # 2570-2574). In short, the district court concluded that "here, there is no reason to withhold judicial resolution." (MSJ Opinion, RE 135, PageID # 2574).

The district court then went on to reject Metro's "voluntary payment" argument. (MSJ Opinion, RE 135, PageID # 2574-2575). The district court did not limit its analysis purely to the common law doctrine, notwithstanding Metro's assertion to the contrary. (Appellant's Br. 1). The district court characterized this argument as follows:

> Metro also argues that the plaintiffs' takings claims fail, because each of them (with certain exceptions not relevant here) voluntarily complied with the Sidewalk Ordinance without protesting or objecting. This argument—which is conceptually related to Metro's ripeness argument—posits that a plaintiff cannot show that "he or she has been compelled to hand over property unless and until the government decides whether its law or regulation will be applied to [the] property." (Doc. No. 111 at 12 (citing *Palazzolo*, 533 U.S. at 620–21).)

(MSJ Opinion, RE 135, PageID # 2574). The district court rejected Metro's citations to due process cases as not relevant and then analyzed whether Metro could satisfy the affirmative defense of voluntary payment. (MSJ Opinion, RE 135, PageID # 2574-2575). The district court concluded that "pa[ying] an in-lieu fee in order to obtain a building permit, without formally protesting or objecting, does not establish the elements of voluntary payment" and declined to apply the doctrine in this context because "an unconstitutional condition is arguably, by its nature, coercive and violative of public policy." (MSJ Opinion, RE 135, PageID # 2575).

Metro raises the argument that the Sidewalk Ordinance did not cause the injury suffered by the Plaintiffs (who incurred costs because of their compliance with the Ordinance) for the first time in this appeal.

## SUMMARY OF THE ARGUMENT

The district court correctly concluded that Plaintiffs' claims are final and rejected Metro's "voluntary payment" argument. The central principle behind the U.S. Supreme Court's decision in *Knick v. Township of Scott* overruling *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), was that takings plaintiffs should not face a requirement that they exhaust state remedies; they should be treated just like all other civil rights plaintiffs, for whom the Civil Rights Act of 1871 "guarantees a federal forum for claims of unconstitutional treatment at the hands of state officials." 588 U.S. 180, 185 (2019) (internal quotation marks and citations omitted). Because of this exhaustion requirement, the Supreme Court noted that "the guarantee of a federal forum rings hollow for takings plaintiffs." *Id.* A few years after *Knick*, in *Pakdel v. City & County of San Francisco*, the Supreme Court underscored this point, holding that its *Knick* holding was not limited to state court remedies, but was an abrogation of any exhaustion requirement. 594 U.S. 474 (2021).

What survived *Knick* and *Pakdel* is the "relatively modest" finality requirement that "there is no question about how the regulations at issue apply to the particular land in question." *Id.* at 478 (citation modified). As the district court correctly found, there is no question about how the Sidewalk Ordinance applied to

Plaintiffs' properties. For each of Plaintiffs' properties, Metro established its final position that the Ordinance applied, and no avenues remain to modify that position.

In light of Metro's loss before this Court in *Knight*, as well as its concession there that the Sidewalk Ordinance cannot satisfy the *Nollan-Dolan* test, Metro now attempts to avoid compensating all the property owners it harmed by arguing that their claims are unripe. Metro's "ripeness" challenge, however, boils down to arguing that Plaintiffs did not exhaust administrative remedies—remedies that would not result in an abatement of the Ordinance's requirements. Rather than grapple honestly with the Plaintiffs' valid claims, Metro argues, without any support, that complying with an express permit condition is "voluntary" because the Plaintiffs could have followed "established processes" to their conclusion and, for the first time on appeal, that Plaintiffs' compliance with the Ordinance was not caused by Metro because it was supposedly voluntary. (Appellant's Br. 4).

Both of these arguments are nothing more than an attempt to smuggle in an exhaustion requirement that the U.S. Supreme Court has repeatedly rejected. Metro passed an Ordinance, required Plaintiffs to comply as a condition of receiving building permits, and Plaintiffs complied. Finality requires nothing more. And, land-use exactions like this are inherently coercive; thus, compliance is not voluntary.

Thus, this Court should affirm the district court's finality ruling and reject Metro's appeal.

# ARGUMENT

## I. PLAINTIFFS' CLAIMS SATISFY FINALITY.

### A. *Williamson County*'s exhaustion requirement has been overturned.

"[A] government violates the Takings Clause *when it takes property without compensation*, and a property owner may bring a Fifth Amendment claim under § 1983 *at that time*." *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019) (overruling *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985)) (emphasis added). "[B]ecause the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action." *Id.* In reaching this conclusion in *Knick*, the Supreme Court harmonized constitutional claims in the takings context with other constitutional claims. In every other context, "the settled rule is that exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983." *Id.* at 185 (citations and internal quotations omitted) (cleaned up).

Despite *Knick*'s clear language, subsequent court decisions initially reflected confusion among courts about whether *Knick* had overruled *Williamson County* in its entirety or whether the law still required exhaustion of state *administrative* remedies following *Knick*. Some courts—as Metro again asks this Court to do—continued to require exhaustion of *administrative* remedies under the belief that *Williamson County* had not overruled the exhaustion requirement in the

administrative context. However, the U.S. Supreme Court revisited the issue, ruling in 2021 that this "view of finality is incorrect." *Pakdel v. City & Cnty. of San Francisco, Cal.*, 594 U.S. 474, 478 (2021). In *Pakdel*, the Court held that the requirement of finality is "relatively modest," requiring that "[a]ll a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question." *Id.* (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997) (internal quotations omitted and cleaned up)).

It is important to note that *Williamson County*'s surviving finality prong was always concerned with prudential ripeness. *Suitum*, 520 U.S. at 733-34. Prudential ripeness "is concerned with (1) whether a claim is fit for judicial review; and (2) the hardship to the parties." *SW Nashville EB Owner, LLC v. Metropolitan Government of Nashville & Davidson County, Tennessee*, No. 3:24-cv-00710, 2025 WL 875366, at *12 (M.D. Tenn. Mar. 20, 2025) (quoting *Carman v. Yellen*, 112 F.4th 386, 401 (6th Cir. 2024)). Finality is a prudential, rather than jurisdictional, requirement and is not applied "mechanistically." *Lilly Invs. v. City of Rochester*, 674 F. App'x 523, 526 (6th Cir. 2017). "Application of this doctrine requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Jackson v. City of Cleveland*, 925 F.3d 793, 807 (6th Cir. 2019) (citation and internal quotation marks omitted).

Notwithstanding the modesty of this prudential requirement, this Court has noted that its continuing vitality has been repeatedly called into question by the U.S. Supreme Court. *Carman*, 112 F.4th at 400 (collecting Supreme Court cases noting "tension" between prudential ripeness and "virtually unflagging" obligation of federal courts to hear cases within their jurisdiction). The doctrine continues to be applied where "important future intervening events, such as impending regulatory action, will clarify the dispute or obviate the need for weighing in on contingencies," *id.* at 400, but is generally not applied where the issues are "purely legal" or "will not be clarified by further factual development." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).

### B. For land-use exaction claims like those here, compliance with the Ordinance satisfies finality.

Though this Court has applied *Pakdel*'s modest finality test to physical takings, given its prudential nature, "courts have sculpted the ripeness doctrine to fit the type of takings claim involved." *Barber v. Charter Twp. of Springfield, Mich.*, 31 F.4th 382, 388 (6th Cir. 2022). Thus, "ordinarily, with a physical taking, the taking itself is viewed as a final action because, once the property's value has been allegedly destroyed, there is nothing else to do." *Id.* (internal quotations and citations omitted) (cleaned up).

Land-use exactions like the Sidewalk Ordinance similarly leave nothing else to do once the coercive choice between relinquishing a constitutional right and using

one's property has been presented to the property owner. *Koontz*, 570 U.S. at 614-15 (holding in land-use exaction context that *per se* takings approach is appropriate "when the government commands the relinquishment of funds linked to a specific, identifiable property interest"); *Knight*, 67 F.4th at 828 (once "coercive pressure" is applied, it does not matter even if the property owner refuses to succumb to it). Thus, compliance with the Ordinance following a determination that it applies—*i.e.*, building sidewalk or paying an in-lieu fee—satisfies this notion of finality. No future intervening events will further clarify the dispute in this case.

In fact, some courts outside the Sixth Circuit have held that *Williamson County*'s prudential "finality requirement does not apply to land-use exaction claims," like those here. *E.g.*, *Newberg Crestview, LLC v. City of Newberg*, No. 3:22-cv-1289-AR, 2023 WL 8372167, at *4 (D. Or. Dec. 4, 2023) (citing *Fowler v. Guerin*, 899 F.3d 1112, 1117 (9th Cir. 2018)). The rationale of these courts is important if the Court is to sculpt the proper finality standard to apply here.

*Newberg* explains in great detail why this finality requirement does not apply to land-use exactions, first noting that it "'developed in the regulatory taking context,' and has not been extended to other types of takings." *Id.* at *4 (quoting *Suitum*, 520 U.S. at 733 n.6; citing *Pakdel*, 594 U.S. at 475). "Indeed, the justification for the finality requirement is only applicable in the context of regulatory takings." *Id.* at *5. This is because the underlying principle in the

regulatory takings context is "that only a regulation that 'goes too far' results in a taking." *Id.* (quoting *Suitum*, 520 U.S. at 734). Because a court must examine various factors, such as "economic impact and interference with reasonable investment-backed expectations," the degree of "impact" and "interference" are determinative of whether a regulatory taking has occurred. *Id.*; *see also Knight*, 67 F.4th at 823 (noting that the takings analysis for land-use *regulations*—unlike land-use exactions—turn on the degree of interference with use, applying the *Penn Central* balancing test to determine whether the regulation "goes too far").

"That reasoning does not apply to land-use *exaction* claims, which are based on broadly applicable regulations that 'go[] too far' and do not entail the same fact-intensive inquiry as do regulatory takings claims." *Newberg Crestview, LLC*, 2023 WL 8372167, at *5 (citing *Koontz*, 570 U.S. at 614).[12] In *Knight*, that is exactly what Metro said the Sidewalk Ordinance is—a 'legislative' condition for all permits." *Knight*, 67 F.4th at 829.

Land-use exaction claims are not about burdening or limiting use of land, but about conditioning land use on agreement to what would on its own constitute an unconstitutional taking without just compensation. *See, e.g.*, *Koontz*, 570 U.S. at 614-15 (holding in land-use exaction context that *per se* takings approach is

[12] The *Newberg* court reiterated this holding when the city advanced the same argument in a subsequent motion to dismiss. *Newberg Crestview, LLC v. City of Newberg*, No. 3:22-cv-1289-AR, 2024 WL 4581543, at *3-4 (D. Or. Oct. 25, 2024).

appropriate "when the government commands the relinquishment of funds linked to a specific, identifiable property interest"); *Knight*, 67 F.4th at 825 (coercion to "give in" to demand that "has no connection" to a project's costs "falls near the core of the Takings Clause, which bars the government from forcing a few people to bear the full cost of public programs that 'the public as a whole' should pay for," where the conveyance would have been "a classic taking" absent the permit condition (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960))). In other words, land-use exaction claims present a "choice between the owner's right to just compensation and a building permit." *Knight*, 67 F.4th at 828. In that way they are *per se* takings and should be treated like them for purposes of ripeness and finality.

Regardless of whether this Court, here or in some later case, abandons the prudential ripeness requirement for land-use exactions, the requirement must not be applied "mechanistically." In a takings case, once the government has determined that it will condition a building permit on foregoing a property right and a property owner has complied, a taking has occurred. Once "coercive pressure" is applied, it operates the same as a physical taking. *Knight*, 67 F.4th at 828. As this Court noted in *Knight*, it does not matter that a plaintiff "refused to yield to the city's conditions and chose not to develop his property." *Id.* Nor "[d]oes it matter that the sidewalk ordinance allowed [the plaintiffs] to pay fees rather than build sidewalks." And, it does not matter that an easement was not granted if in-lieu fees were paid. *See id.*

(noting that the *Koontz* plaintiff also did not grant an easement). The takings violation under the Sidewalk Ordinance is ripe as soon as there is compliance because of the coercive choice Metro presented to property owners like Plaintiffs who sought a permit.

There is no dispute that Plaintiffs were harmed by an unconstitutional land-use exaction. As a result, whatever survives of *Williamson County*'s prudential finality requirement should be applied with this reasoning in mind. In this context, compliance with the Sidewalk Ordinance is, on its own, sufficient to satisfy the relatively modest burden of *de facto* finality.

## II. COMPLIANCE WITH THE SIDEWALK ORDINANCE WAS NOT VOLUNTARY.

### A. Land-use exactions like the Sidewalk Ordinance are inherently coercive and compliance is not voluntary.

Plaintiffs assert a takings claim premised on a land-use exaction—permit seekers must comply with the Sidewalk Ordinance as a condition for receiving a building permit. Were there any dispute on this issue, this Court resolved it in *Knight*. *See, generally,* 67 F.4th 816. As this Court pointed out in *Knight*, exactions like the one at issue here are inherently coercive. *Id.* at 825. There, this Court explained this coercive pressure quite cogently:

> On the other hand, the government might try to leverage its monopoly permit power to pay for unrelated public programs on the cheap. [*Koontz*, 570 U.S.] at 604-05, 133 S.Ct. 2586. If the expected value of an owner's proposed project exceeds the condition's expected costs, the

> owner has an incentive to give in to this "demand" even when the demand has no connection to the project's harmful social effects. *Id.* at 605, 133 S.Ct. 2586. Yet this type of coercion falls near the core of the Takings Clause, which bars the government from forcing a few people to bear the full cost of public programs that "the public as a whole" should pay for. *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

*Id.*

Metro's Sidewalk Ordinance directly implicates this concern. Metro's Sidewalk Ordinance concerned itself *solely* with the general, public benefits of a sidewalk network and never with the particular social effects or costs of a particular project. (Metro. Code § 17.20.120, RE 125-1, PageID # 1766; Metro's *Knight* Appellate Brief at 3-4, RE 125-2, PageID#: 1785-86.) Implicitly, Metro's assertion that Plaintiffs voluntarily complied with the Sidewalk Ordinance amounts to an argument that by "succumb[ing] to the 'coercive pressure' to waive [a] constitutional right" and giving in when presented with "the choice between the owner's right to just compensation and a building permit," the Plaintiffs have rendered themselves unable to challenge Metro's taking. *Id.* at 828. That is, Metro first coerced compliance out of Plaintiffs and others, and Metro now argues that this compliance was voluntary.

Fortunately for Plaintiffs, that is not the law. In October 2024, the *Newberg* court considered and rejected a similar argument framed as a "waiver." *Newberg Crestview, LLC v. City of Newberg*, No. 3:22-cv-1289-AR, 2024 WL 4581543, at

*4-6 (D. Or. Oct. 25, 2024) There, the defendant city argued that, because the plaintiff "agreed to the conditions imposed," it had "waived any claim that the required improvements were not proportional to the proposed development." *Id.* at *4. Rejecting this argument, the *Newberg* court held that "[w]here, as here, government has conditioned a discretionary benefit on the waiver of a constitutional right, the court will not enforce the waiver." *Id.* at *6 (citation omitted).

Similarly, in *Heritage at Pompano Housing Partners, L.P. v. City of Pompano Beach, Fla.*, the district court confronted essentially the same argument framed as "acquiescence, failure to object, consent, contract, and estoppel." No. 0:20-cv-61530-RS, 2021 WL 8875658, at *5 (S.D. Fla. Dec. 15, 2021). There, the defendant city argued "that Plaintiff should be prohibited from bringing this action because it failed to raise any objections to constructing the Improvements prior to bringing suit" and ultimately entered into a "Developer Agreement." *Id.* at *7. Because "it was never given the opportunity to address Plaintiff's claim that the Improvements constituted a prohibited exaction because Plaintiff never raised the claim prior to filing its pre-suit notice," the Plaintiff was barred from "now rais[ing] the issue having failed to raise it at a time when the City could have addressed it." *Id.* The *Heritage* court concluded that because the challenged improvements "were required by the City Code," their inclusion "in Plaintiff's initial application was not voluntary." *Id.*

This is all because when the government coerces an individual to part with money or other value, it is not subject to the "voluntary payment doctrine." *See Silver Buckle Mines, Inc. v. United States*, 132 Fed. Cl. 77, 85-87 (2017) (rejecting voluntary payment doctrine defense where U.S. posed choice between paying maintenance fees or losing mining claims). In *Silver Buckle*, the court noted that in the context of an exaction, individuals and businesses, like Plaintiffs here, "faced a choice that hardly rendered compliance a voluntary act." *Id.* at 86.

### B. For permit applicants like Plaintiffs, compliance with the Sidewalk Ordinance was inescapable.

Under the Sidewalk Ordinance, "there is no question about how the regulations at issue apply to the particular land in question." *Pakdel*, 594 U.S. at 478 (cleaned up). The Ordinance itself is clear. The requirement to build sidewalk or pay a contribution in lieu of building sidewalk is a permit condition. (Metro. Code § 17.20.120(D)(3) and (F), RE 125-1, PageID # 1769.) It establishes a waiver procedure, but that procedure likewise imposes a non-refundable fee of several hundred dollars. (Metro. Code § 17.20.120(A)3.a-g, RE 125-1, PageID # 1767-68; Hargis Depo. 135:6-136:9, 138:17-139:25, and Ex. 10, RE 125-6, PageID # 1881-84, 1921-22.) Simply put, there was no avenue to escape application of the Sidewalk Ordinance that did not impose costs in the hundreds of dollars.

Moreover, the Ordinance itself limits the availability of relief and the discretion to grant it in a way that it can never be granted on the basis of reasons that

would satisfy the *Nollan-Dolan* requirements of a nexus and proportionality. The Sixth Circuit described this three-step test as follows:

> At the "first step," a court asks whether the condition would qualify as a taking if the government had directly required it. *Koontz*, 570 U.S. at 612, 133 S.Ct. 2586. If not, no takings problem exists. *Id.* If so, the government must show a "nexus" between the condition and the project's social costs; that is, the government must impose the condition because of those costs and not for other reasons. *Nollan*, 483 U.S. at 837, 107 S.Ct. 3141. The government next must show a "rough proportionality" between the condition and the project; that is, the condition's burdens on the owner must approximate the project's burdens on society. *Dolan*, 512 U.S. at 391, 114 S.Ct. 2309.

*Knight*, 67 F.4th at 825.

The circumstances under which the Zoning Administrator may authorize a waiver cannot satisfy these requirements because they do not permit an applicant to challenge, or the Zoning Administrator to consider, whether a specific project imposes *any* social costs, even less whether they are connected to the permit condition (*i.e.*, the building of sidewalk or payment of an in-lieu fee). As a result, Metro can never show that it "impose[d] the condition because of those costs and not for other reasons." *Id.* In fact, the Sidewalk Ordinance itself imposes the conditions and identifies their purpose, which consists *entirely* of such "other reasons," all relating to the general benefits of a sidewalk network. *Id.* This is precisely the sort of "public program" that the Sixth Circuit had in mind when it stated in *Knight*:

> Yet this type of coercion falls near the core of the Takings Clause, which bars the government from forcing a few people to bear the full cost of public programs that "the public as a whole" should pay for.

*Id.* at 825 (citations omitted). Even if Metro could establish a nexus, it could not establish "rough proportionality" because it never considered (and the Ordinance did not permit it to consider) the projects' burdens on society to determine if the burdens on the owner "approximate" them. *Id.*

Metro's repeated reference to the "checkbox" on its waiver application is hardly illuminating. (Appellant's Br. 16, 19). That is because merely pointing to a form that allows a permit applicant to indicate the type of relief they *would like*, says nothing about the availability of or conditions for granting such relief. Metro steadfastly ignores the Ordinance's text on this, which is very specific about when waiver is possible. The answer is rarely. The principal relief available to permit applicants is to be permitted to *pay the in-lieu fee* rather than building sidewalk, a Hobson's choice. The circumstances for granting relief are prescribed and have nothing to do with a *Nollan-Dolan* analysis. There is virtually no discretion involved in granting relief.

Moreover, Metro's entire argument in *Knight* was premised on this central fact that there was no discretion for the zoning administrator and that the Sidewalk Ordinance itself imposed a legislative condition on all permits:

> The city agrees that *Nollan* might have applied if *zoning administrators*, acting on a discretionary basis, had required Knight and

> Mayes to build sidewalks or pay fees as an "administrative" condition for their specific permits. But *Nashville's council* passed the ordinance as a "legislative" condition for all permits. This legislative source, according to Nashville, should lead us to apply *Penn Central*'s test.

*Id.* at 828-29. That is why Metro conceded it could not meet *Nollan-Dolan* before the Sixth Circuit in *Knight*. When asked by the panel during oral argument, Metro conceded that the *Nollan-Dolan* test that applies to the Sidewalk Ordinance is "an extremely difficult standard to meet, and the sidewalk ordinance likely doesn't meet that standard." *Id.* at 836. Despite the *Knight* plaintiffs devoting "pages of their brief [to] arguing that the city could not meet *Nollan*'s and *Dolan*'s elements," Metro "did not even try to respond, opting to rely exclusively on its claim that *Penn Central*'s test applied." *Id.* Indeed, the Sixth Circuit accepted this premise and ruled against Nashville. That is presumably why Metro agreed to a permanent injunction barring its enforcement of the Sidewalk Ordinance and ceasing all use of the funds. (*Knight* Agreed Order for Entry of Judgment, RE 125-3, PageID # 1836.)

Even the district court in *Knight* raised similar concerns in its summary judgment decision. There, the court stated that even if Metro can satisfy the essential nexus prong (which the language from the Sixth Circuit in *Knight* above suggests it cannot) "the plaintiffs are likely correct" that the Sidewalk Ordinance cannot pass satisfy *Nollan-Dolan* because:

> Metro has not made the type of individualized assessment required to meet the "rough proportionality" component of the test. As the Sixth

> Circuit explained in *F.P. Development*, "[t]he 'required relationship' does not have to be 'exacting,' but it cannot be 'generalized,'" and the government authority "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.'" *F.P. Dev., LLC*, 16 F.4th at 206 (quoting *Dolan*, 512 U.S. at 389–91, 114 S.Ct. 2309). Although the BZA arguably considered Knight's and Mayes' individual circumstances in denying their requests for a variance, the basis for the decisions included such findings as that the establishment of a "connected pedestrian network via sidewalks and greenways" in Knight's neighborhood was "critical to planning goals," that Metro Water Services indicated that no hardship would prevent the construction of sidewalks on Knight's street, and that Knight's property was near major thoroughfares and a newly built greenway. (*See* Doc. No. 26, at 9–10.) In both *Dolan* and *F.P. Development*, such generalized and conclusory findings were insufficient. *Dolan*, 512 U.S. at 389–91, 114 S.Ct. 2309; *F.P. Dev.*, 16 F.4th at 206.

*Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 572 F. Supp. 3d 428, 443–44 (M.D. Tenn. 2021). The problem for Metro's position—beyond conceding in both word and deed that the Sidewalk Ordinance simply cannot be enforced constitutionally—is that the Ordinance itself prohibits the Zoning Administrator from considering the *Nollan-Dolan* factors.

In sum, the only way for a property owner to avoid the burdens the Sidewalk Ordinance imposed on property rights was to "refuse[] to yield to the city's conditions and cho[o]se not to develop his property." *Knight*, 67 F.4th at 828.

## III. METRO ASKS THIS COURT TO FLOUT *KNICK* AND *PAKDEL* AND REVIVE THE EXHAUSTION REQUIREMENT UNDER THE GUISE OF "VOLUNTARINESS."

### A. Metro's description of the Plaintiffs' compliance as "voluntary" is a rhetorical Trojan Horse for exhaustion.

As explained above, the Ordinance was inescapable for permit applicants. Even property owners who sought waivers incurred costs, and the narrowly prescribed circumstances when a waiver was permitted left no discretion for Metro to consider the *Nollan-Dolan* factors. Metro nevertheless argues that anything short of following its administrative procedures to their conclusion represents a voluntary choice to build sidewalk or pay an in-lieu fee. Metro does not use the vocabulary of exhaustion. It does not say outright that these procedures must be exhausted for a claim to be ripe. Instead, it says that voluntary compliance means a claim is not ripe.

But what makes compliance "voluntary" according to Metro? "[F]orgoing multiple established processes for seeking Metro's full discretionary authority." (Appellant's Br. 19). According to Metro, a finding that Plaintiffs' claims are ripe here means that "plaintiffs can now decide for themselves how much final discretion from the local government they wish to pursue to satisfy the finality requirement." (Appellant's Br. 1). Metro, it seems, desires a rigid, bright-line rule that requires takings plaintiffs to pursue a government's "established processes" until their authority has been exhausted.

In short, Metro argues for a mechanistic application of a requirement that takings plaintiffs pursue every administrative remedy before their claim is ripe. But, in *Knick* and *Pakdel*, the Supreme Court did away with an exhaustion requirement. And, this Court has held that the remaining prudential finality requirement is not to be applied mechanistically.

### B. Metro's description of finality in the takings context is not supported by the law.

Metro presents what can at best be described as a mistaken account of the current state of the law regarding finality in the takings context. This results from Metro's reliance on pre-*Knick* and pre-*Pakdel* caselaw interspersed with propositions from those cases. Perhaps the most illustrative example comes from this paragraph found in Metro's section entitled "Finality and ripeness in the takings context":

> Accordingly, a valid takings claim "depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, *including the opportunity to grant any variances or waivers allowed by law*." *Id*. (emphasis added). "This requirement ensures that a plaintiff has actually been injured by the Government's action and is not prematurely suing over a hypothetical harm." *Pakdel v. City & Cnty. of San Francisco, California*, 594 U.S. 474, 479 (2021) (cleaned up).

(Appellant's Br. 13). The case cited by "*Id.*" is *Palazzolo v. Rhode Island*, 533 U.S. 606, 620-21 (2001), which pre-dates the *Knick* decision's overruling of *Williamson County*'s exhaustion requirement by approximately 18 years.

From this passage of Metro's brief, a reader might believe that *Pakdel* court, in 2019, endorsed this language from the *Palazzolo* court's 2001 decision. It did not. The "requirement" in the *Pakdel* quote is simply a reference to "the finality requirement" (and *not* to some lengthy list of potential administrative steps plaintiffs must take) from the immediately preceding sentence, which goes on to note that "nothing more than *de facto* finality is necessary." *Pakdel*, 594 U.S. at 479.

In fact, one passage in *Pakdel* makes it particularly clear that the pairing of these quotes is misleading. The passage begins by describing the Ninth Circuit majority's decision:

> In other words, a conclusive decision is not really "final" if the plaintiff did not give the agency the "opportunity to exercise its 'flexibility or discretion'" in reaching the decision. *Id.*, at 1167–1168.

*Id.* at 478. Then, the Supreme Court expresses agreement with the Ninth Circuit dissent as follows:

> Judge Bea dissented, explaining that the "'finality'" requirement looks only to whether "'the initial decisionmaker has arrived at a definitive position on the issue.'" *Id.*, at 1170. In his view, an additional demand that plaintiffs "follo[w] the decisionmaker's administrative procedures" would "ris[k] 'establish[ing] an exhaustion requirement for § 1983 takings claims,' something the law does not allow." *Ibid.* And when the Ninth Circuit declined to rehear the case *en banc*, Judge Collins dissented along the same lines. He expressed concern that "the panel's unprecedented decision sharply depart[ed] from settled law and directly contravene[d] . . . *Knick*" by "impos[ing] an impermissible exhaustion requirement." 977 F.3d 928, 929, 934 (2020).

## II

> We, too, think that the Ninth Circuit's view of finality is incorrect. The finality requirement is relatively modest. All a plaintiff must show is that "there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Suitum*, 520 U.S. at 739, 117 S.Ct. 1659 (brackets omitted).

*Id.* At best, Metro's statement of the law is misleading.

**C. Metro relies on several inapplicable cases to bolster its effort to use "voluntariness" to revive exhaustion in this context.**

In selecting cases to support its finality and voluntariness argument, Metro does not cite to a single land-use exaction case. In other words, every case Metro relies on is missing the single most material factual similarity to this case—the inherent coerciveness of land-use exactions.

In addition to various inapposite cases it raised in the district court (addressed below), Metro cites one very recent case that illustrates this point: *Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955 (6th Cir. 2026). In *Roberts*, Metro accurately explains that a white plaintiff, who started but never submitted an online application for a grant that Progressive Preferred Insurance Co. offered for black-owned businesses, was dismissed for lack of standing. (Appellant's Br. 26). This case and *Roberts* are hardly on all fours. Progressive is a private entity, not a state or local government. There is no analogy between the rights property owners have in their real property and the possible receipt of grant money from a private entity. And, there is no coercive choice being presented to the *Roberts* plaintiff by conditioning the exercise of one right on the relinquishment of another. But the

biggest problem for Metro is obvious from its own description of the facts: the plaintiff in *Roberts* did not actually submit an application. The Plaintiffs here, in contrast, sought a permit and were told that the Sidewalk Ordinance applied to their property. They faced a choice—forgo building on property they owned or comply with the sidewalk ordinance. The plaintiff in *Roberts* faced no such choice because he had no right to $25,000 of Progressive's money and was uninjured if he never sought the money.

Not unlike *Roberts*, Metro relies on this Court's decision in *Grand v. City of Univ. Heights, Ohio*, 159 F.4th 507 (6th Cir. 2025). The plaintiff in *Grand* initially sought a special use permit to operate a house of worship in his home but withdrew the application before the city made a decision. *Id.* at 510-11. The city "never issued a final decision—or for that matter any decision"—about whether the zoning regulation applied to the proposed gatherings at the plaintiff's home. *Id.* at 512. Yet again, *Grand* was not a land-use exaction case, and the plaintiff abruptly abandoned the application process. This is in stark contrast to the Plaintiffs here, who applied for a permit and were made to comply with the Ordinance as a condition of receiving the permit.

As it did below, Metro again relies heavily on two inapposite cases, *Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992) and *McCarthy v. City of Cleveland*, 626 F.3d 280 (6th Cir. 2010). Neither case stands for the proposition that Plaintiffs

here must have exhausted administrative remedies in order for their compliance with Metro's Sidewalk Ordinance to be truly "compelled." Both *Yee* and *McCarthy* predate *Knick* and *Pakdel*, and neither deal with a land-use exaction.

*Yee* dealt with a challenge to an ordinance restricting the bases of eviction from rented lots where mobile homes were parked and an ordinance imposing rent control on mobile home parks. 503 U.S. at 524-25. The plaintiffs in *Yee* did *not* voluntarily comply with the ordinances; rather, they challenged them. They did, however, "voluntarily open their property to occupation by others," meaning they could not argue that there was a *per se* taking (of the sort this Court found in *Knight*). *Id.* at 531. In other words, *Yee* was not a *per se* takings case at all, but rather a land-use regulation case. *Id.* at 532. This is nothing like the present case where Plaintiffs and the putative class members were required to comply with legislative conditions on the receipt of a permit.

*McCarthy* did not implicate a taking at all. 626 F.3d at 285-86. Instead, it was a challenge to fees resulting from traffic violations captured by automatic cameras (rather than a specific fund of money). *Id.* at 282-83, 285. In fact, Metro cites a *concurrence* that reads *Yee*'s "voluntary" language more broadly than is warranted and that expressly relies on the *Williamson County* exhaustion requirements rejected by the Supreme Court in *Knick* and *Pakdel*. *Id.* at 287-89 (McKeague, J.,

concurring).[13] In reaching the conclusion that the plaintiffs must show that their compliance was involuntary, Judge McKeague's concurrence expressly relied on *Williamson County*'s exhaustion requirement. *See id.* at 288 ("Yet, even where there is a 'taking' of private property by the government, it is not actionable as an unconstitutional taking until after the property owner has first invoked any available process for obtaining compensation and received a final decision from the governmental entity on the merits.") (citing *Williamson County*). Judge McKeague authored this concurrence nearly a decade before *Knick* overruled *Williamson County*'s exhaustion requirement and more than a decade before *Pakdel* made clear that *Knick* intended to *completely* overrule *Williamson County*'s exhaustion requirements.

The few additional cases Metro cites are equally inapposite. For example, *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo.*, dealt with a claim premised on being asked to provide county officials with illegal cash payments in exchange for those officials referring business. 673 F.3d 799, 806 (8th Cir. 2012). The plaintiff there willingly paid illegal bribes for business referrals from the government. It is difficult to imagine having a right to business referrals. Here, Plaintiffs complied with an Ordinance *after* the Metro Codes Department determined it applied to the properties

[13] The majority relied on entirely separate grounds to find there was no unconstitutional taking.

for which they sought a building permit. The Plaintiffs made no illegal payments, and they sought no business referrals to which they were not constitutionally entitled.

*Gradisher v. Cnty. of Muskegon* is equally inapposite. 255 F. Supp. 2d 720 (W.D. Mich 2003). *Gradisher* was a procedural due process case that dealt with an ordinance requiring payment of a $25 fee for dishonored checks. *Id.* The fee is substantially smaller than any cost or burden imposed here and is simply unlike the exaction imposed by the permitting conditions in Metro's Sidewalk Ordinance. Additionally, Metro omits that this Court's brief order affirming the decision simply refers to its reasoning in a related case regarding what appears to have been the same, or essentially the same, ordinance, in which it declined to decide whether the "plaintiffs lacked a protected interest because they voluntarily paid" the fee, ruling instead that they had received adequate process. *Silvernail v. Cnty. of Kent*, 385 F.3d 601, 604 (6th Cir. 2004).

Metro also cites *Evans v. City of Ann Arbor*, a case in which the plaintiffs did not allege that the defendant city took or deprived them of property. No. 3:21-cv-10575, 2022 WL 586753, at *10 (E.D. Mich. Feb. 25, 2022). Instead, the defendant city inspected a property, and the plaintiffs "voluntarily paid a private party . . . for insulation work pursuant to a contract." *Id.* The court held the city defendants "are simply not implicated." *Id.* In short, the case stemmed from a construction dispute

and is simply not relevant here. *Id.* at *1-3. Finally, it is noteworthy that *Evans* once again relies on *McCarthy*, which as noted is inapplicable.

Like these other cases, *Manistee Apartments v. Chicago*, which Metro cites for the proposition that "[r]elinquishment and deprivation do not mean the same thing," is also distinguishable. No. 1:14-cv-6813, 2015 WL 10853988, at *2 (N.D. Ill. Apr. 3, 2015). It deals with the payment of a default judgment entered against the owner for building code violations to the city in order to clear a lien that was preventing a sale of a property. *Id.* at *1. The plaintiff brought a procedural due process claim. *Id.* at *2. That context explains why voluntarily paying the judgment was fatal. "Once plaintiff voluntarily paid the requested amount, it no longer could demand the due process to which it would have been entitled if it had not voluntarily surrendered its interest." *Id.* (citation modified). What the plaintiff sought was *process*. Moreover, it is critical that there was no coercion. *See id.* at *2 ("More than two years after the entry of the judgment order, plaintiff affirmatively sought out defendant to ask how much defendant wanted."). This is nothing like the present case, in which Plaintiffs applied for a building permit and were forced to comply with the Ordinance as a condition of receiving it.

Indeed, the district court correctly recognized that the various cases cited by Metro "largely involve due process claims decided in the context of plaintiffs' voluntary payment of fines for civil or criminal infractions." (MSJ Opinion, RE 135,

PageID # 2574-75). Metro attempts to escape this conclusion by citing to *Eastern Enterprises v. Apfel*, 524 U.S. 498, 537 (1998), arguing that the Court should consider procedural due process holdings to apply by analogy in the takings context. The cited case does not support this proposition. *Eastern Enterprises* did not go so far. It dealt with a case in which the plaintiff business was made subject to retroactive liability for health benefits to the miners they had employed by the Coal Act. *Id.* at 516-18. The plaintiff asserted that the unique nature of this claim amounted to a taking and a substantive due process violation. *Id.* at 537. All the Supreme Court noted was that the "analysis of legislation under the Takings and Due Process Clauses is correlated *to some extent*." *Id.* (emphasis added). Notably, the Supreme Court declined to address the due process claim. *Id.* at 538. This tepid statement by the Supreme Court followed by a refusal to reach the due process issue in the case before it hardly seems like the robust endorsement of an uncritical extension of procedural due process holdings to the takings context Metro advances. (Appellant's Br. 25) ("the rationale of those cases applies equally here" and "[t]hose holdings apply by analogy here, and the same result is warranted"). This is especially true where, as here, the cited cases are factually and legally distinguishable in virtually every material respect.

The remainder of the cases cited by Metro stray even further from the mark and are primarily cited for the proposition that "self-inflicted" injuries do not satisfy

the standing analysis. For example, *Buchholz v. Meyer Njus Tanick, PA*, dealt with a Fair Debt Collection Practices Act claim by a debtor who sued because he received letters from the defendant that made him feel anxious and fear he might be sued if he did not promptly pay. 946 F.3d 855, 859 (6th Cir. 2020). This was just a "fear of a future harm." *Id.* at 865. And, "a plaintiff cannot create an injury by taking precautionary measures against a speculative fear" by meeting with an attorney. *Id.* at 865-66. Moreover, the only injury traceable to the letters was the plaintiff's own anxiety "about the consequences of his decision to not pay the debts that he does not dispute he owes." *Id.* at 866. Undoubtedly, it is correct that anxiety about facing the consequences of one's own decisions would be a "self-inflicted" injury. But this case lacks the coercive nature of a land-use exaction and the legal and factual context could hardly be more dissimilar. Plaintiffs here sought a permit to build on their property, and Metro told them to comply with its Sidewalk Ordinance to receive it. They did so. That is a concrete injury directly traceable to Metro's actions.

Similarly, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), held the plaintiffs lacked standing because speculative fears of future surveillance under the FISA Amendments Act does not constitute an injury in fact and that they "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 414-16. Again,

the analogy between that case and the present one is absent. *Clapper* lacks the coercion and real, compelled relinquishment of constitutional rights present here.

Finally, *24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624 (4th Cir. 2016), is no different. There, standing was absent because the alleged harm—implementation of an incumbent's selected nomination method—was voluntary. *Id.* at 632. The Republican Party had voluntarily "defer[red] to the incumbent's selected nomination method by limiting the authority of the [legislative district committee]." *Id.* Yet again, it is impossible to find any analogy between this case and *24th Senatorial Dist*. The fact is, Plaintiffs here were coerced by a land-use exaction—forgo a permit or forfeit a constitutional property right. This is totally unlike *24th Senatorial Dist*.

One final, but critically important, note on Metro's extensive effort to pull together unrelated and irrelevant case law is warranted: Metro has not offered a single land-use exaction case to support its position. In stark contrast, Plaintiffs have provided ample authority supporting the inherent coerciveness of such exactions and demonstrated that the Sidewalk Ordinance in particular was coercive and inescapable for property owners who, like Plaintiffs, sought a building permit on a covered property.

## CONCLUSION

For the foregoing reasons, the district court's decision that Plaintiffs' claims are ripe and final was correct and should be affirmed. Accordingly, Metro's appeal should be denied.

Respectfully submitted this 12th day of June, 2026,

/s/ Joshua A. Frank
**JOSHUA A. FRANK**
**DAVID W. GARRISON**
**SCOTT P. TIFT**
Barrett Johnston Martin & Garrison, PLLC
200 31st Avenue North
Nashville, TN 37203
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jfrank@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

**R. ALEX DICKERSON**
**SARAH M. INGALLS**
Thompson Burton PLLC
Palmer Plaza
1801 West End Avenue, Suite 1550
Nashville, TN 37203
Telephone: (615) 465-6000
Facsimile: (615) 807-3048
alex@thompsonburton.com
singalls@thompsonburton.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,449 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(a).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman in 14-point font.

/s/ Joshua A. Frank
**JOSHUA A. FRANK**
**DAVID W. GARRISON**
**SCOTT P. TIFT**
Barrett Johnston Martin & Garrison, PLLC
200 31st Avenue North
Nashville, TN 37203
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jfrank@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

**R. ALEX DICKERSON**
**SARAH M. INGALLS**
Thompson Burton PLLC
Palmer Plaza
1801 West End Avenue, Suite 1550
Nashville, TN 37203
Telephone: (615) 465-6000
Facsimile: (615) 807-3048
alex@thompsonburton.com

singalls@thompsonburton.com

*Counsel for Plaintiffs-Appellees*

Dated: June 12, 2026

**ADDENDUM:**
**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record Entry No. | Description | PageID # Range |
|---|---|---|
| 1 | Complaint | 1 - 13 |
| 60 | First Amended Complaint | 721 - 747 |
| 61 | Answer to First Amended Complaint | 755 - 765 |
| 80 | Memorandum Opinion on Metro's Motion for Partial Judgment on the Pleadings | 877 - 898 |
| 81 | Order on Metro's Motion for Partial Judgment on the Pleadings | 899 - 900 |
| 105 | Second Amended Complaint | 1179 - 1215 |
| 107 | Answer to Second Amended Complaint | 1220 - 1228 |
| 110 | Metro's Motion for Summary Judgment | 1231 - 1232 |
| 111 | Memorandum in Support of Metro's Motion for Summary Judgment | 1617 - 1646 |
| 123 | Response in Opposition to Metro's Motion for Summary Judgment | 1685 - 1727 |
| 124 | Response to Metro's Statement of Undisputed Material Facts | 1734 - 1746 |
| 125 | Plaintiffs' Statement of Additional Material Facts | 1747 - 1764 |
| 125-1 | Metro Sidewalk Ordinance,<br>Metro. Code §§ 17.20.120, 17.20.125 | 1765 - 1770 |
| 125-2 | Metro's Response Brief, *Knight* Appeal (No. 21-6179, Doc. No. 43) | 1771 - 1832 |
| 125-3 | *Knight* Agreed Order for Entry of Judgment | 1833 - 1836 |
| 125-6 | Excerpts of Deposition of Joey Hargis | 1852 - 2056 |
| 125-7 | Excerpts of Deposition of Jonathan Honeycutt | 2057 - 2065 |
| 125-8 | Excerpts of Deposition of Kristin Kumrow | 2066 - 2227 |

| | | |
|---|---|---|
| 125-9 | Excerpts of Deposition of Jacob Revetta | 2228 - 2236 |
| 125-10 | Second Declaration of R. Alex Dickerson and Attachments | 2237 - 2500 |
| 125-11 | Declaration of Michael Lee | 2501 - 2502 |
| 125-12 | Declaration of Todd Paine | 2503 - 2504 |
| 125-14 | Declaration of Enrique Selman | 2507 - 2508 |
| 128 | Metro's Response to Plaintiffs' Statement of Additional Material Facts | 2518 - 2537 |
| 135 | Memorandum Opinion on Metro's Motion for Summary Judgment | 2559 - 2592 |
| 136 | Order on Metro's Motion for Summary Judgment | 2593 - 2594 |
| 137 | Metro's Motion for Certificate of Appealability | 2595 - 2601 |
| 138 | Plaintiffs' Response to Metro's Motion for Certificate of Appealability | 2602 - 2606 |
| 139 | Motion for Leave to File Amended Complaint | 2607 - 2610 |
| 139-1 | Proposed Third Amended Complaint | 2611 - 2648 |
| 140 | Memorandum and Order Granting Certificate to Appeal | 2649 - 2655 |
| 142 | Order Staying Case Pending Interlocutory Appeal | 2661 |

## CERTIFICATE OF SERVICE

In compliance with Fed. R. App. P. 25(d) and 6th Cir. R. 25(f)(2), I hereby certify that on June 12, 2026, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Sixth Circuit this Brief. Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record who have appeared in the case, specifically including:


The Department of Law
Of the Metropolitan Government of
Nashville and Davidson County
Wallace W. Dietz (#9949)
Director of Law

**J. BROOKS FOX**
**BENJAMIN A. PUCKETT**
Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6375
brook.fox@nashville.gov
benjamin.puckett@nashville.gov

*Counsel for the Defendant-Appellant*

/s/Joshua A. Frank
**JOSHUA A. FRANK**
**DAVID W. GARRISON**
**SCOTT P. TIFT**
Barrett Johnston Martin & Garrison, PLLC
200 31st Avenue North
Nashville, TN 37203
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jfrank@barrettjohnston.com
dgarrison@barrettjohnston.com

stift@barrettjohnston.com

**R. ALEX DICKERSON**
**SARAH M. INGALLS**
Thompson Burton PLLC
Palmer Plaza
1801 West End Avenue, Suite 1550
Nashville, TN 37203
Telephone: (615) 465-6000
Facsimile: (615) 807-3048
alex@thompsonburton.com
singalls@thompsonburton.com

*Counsel for Plaintiffs-Appellees*